UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JANE BELLUCCO,

                    Plaintiff,

       v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.
_____

DECISION & ORDER

15-CV-6483P

## PRELIMINARY STATEMENT

Plaintiff Jane Bellucco ("Bellucco") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Income Benefits ("DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 4).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 9, 10). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

# BACKGROUND

## I.   Procedural Background

Bellucco protectively filed for DIB on July 19, 2012, alleging disability beginning on June 1, 2006, as a result of chronic fatigue syndrome, fibromyalgia, anxiety, panic attacks, depression, high cholesterol, and temporomandibular joint disorder ("TMJ").  (Tr. 177, 180).[1] On September 18, 2012, the Social Security Administration denied Bellucco's claim for benefits, finding that she was not disabled.  (Tr. 76).  Bellucco requested and was granted a hearing before Administrative Law Judge John P. Costello (the "ALJ").  (Tr. 98-99, 120-24 ).  The ALJ conducted a hearing on January 7, 2014.  (Tr. 37-75).  Bellucco was represented at the hearing by her attorney Ida M. Comerford, Esq.  (Tr. 37, 85).  In a decision dated March 17, 2014, the ALJ found that Bellucco was not disabled and was not entitled to benefits.  (Tr. 14-30).

On June 22, 2015, the Appeals Council denied Bellucco's request for review of the ALJ's decision.  (Tr. 1-4).  Bellucco commenced this action on August 14, 2015 seeking review of the Commissioner's decision.  (Docket # 1).

## II.   Relevant Medical Evidence[2]

### A.   Treatment Records

#### 1.   Sandy Sorrentino, MD[3]

The treatment records reflect that Sandy Sorrentino ("Sorrentino"), MD, provided primary care treatment to Bellucco beginning in 1989 and continuing through the time of the administrative hearing.  (Tr. 310-34, 376-420).  Notes from May 1990 demonstrated that

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

[3]  Portions of these treatment records are handwritten and difficult, if not impossible, to decipher. Accordingly, the Court has summarized only those portions of these records that are legible.

2

Bellucco sought treatment for ongoing fatigue that had lasted several months.  (Tr. 377).

Sorrentino assessed possible anemia and ordered bloodwork.  (*Id.*).  Bellucco returned in July

1990 continuing to complain of fatigue and a "cloudy" feeling in her head.  (Tr. 378).  Sorrentino

assessed possible chronic fatigue syndrome, ordered bloodwork, and indicated that he would

consider sending Bellucco to a neurologist if her symptoms did not improve.  (*Id.*).  Other

treatment notes from 1990 and 1991 suggest that Bellucco complained of muscle spasms in her

neck and body aches.  (Tr. 379).  In 1992, Bellucco attended several appointments complaining

of pain in her back and abdomen, ongoing bladder infections, gastrointestinal distress, weakness,

and fatigue.  (Tr. 382-83).

   Bellucco had only two appointments in 1993, which addressed complaints of

earaches and sore throat.  (Tr. 384).  In 1994, Bellucco had two appointments, which addressed

complaints of ear, head and sinus pain.  (Tr. 385).  On December 29, 1994, she had an

appointment in which she complained of facial pain, jaw pain, and vertigo.  (Tr. 386).

Throughout 1995 and 1996, Bellucco continued to see Sorrentino and expressed similar

complaints involving earaches and upset stomach.  (Tr. 387-90).  In October 1996, Bellucco

attended an appointment complaining of chronic back pain.  (Tr. 390).  She returned on

December 13, 1996, complaining of extreme fatigue and weakness.  (Tr. 391).  The treatment

notes indicate that she had been out of work for the previous three days.  (*Id.*).

   During 1997, 1998, and 1999, Bellucco attended several appointments

complaining of severe headaches accompanied by nausea, pain and pressure behind her eyes, ear

pain, sore throat, chest tightness, head congestion, and coughs.  (Tr. 392-400).  In April 2000,

Bellucco attended an appointment complaining of sore throat and body aches in all four

quadrants.  (Tr. 401).  She reported that this pain was new and that her back pain had decreased.

(*Id.*).  In October 2000, she attended another appointment complaining of an irregular heartbeat over the previous week.  (*Id.*).  In December 2000, Bellucco reported ongoing back pain and requested a note for work indicating that she should be permitted to sit while working.  (*Id.*).  Sorrentino complied with her request.  (Tr. 430).

In August 2001, Bellucco attended an appointment complaining of frequent headaches, but during a follow-up appointment in September 2011 she reported that she had not experienced any more migraines.  (Tr. 402).  During 2002 and 2003, Bellucco attended several appointments complaining of cough, ear pain and pressure, and sinus congestion.  (Tr. 403-04).

In February 2004, Bellucco attended an appointment complaining of bilateral shoulder pain.  (Tr. 405).  Sorrentino assessed decreased range of motion.  (*Id.*).  In September 2004, Bellucco complained of ongoing back discomfort that was radiating into her abdomen.  (Tr. 406).  She also complained of increased fatigue, and swelling and tenderness in her chest.  (*Id.*).  Sorrentino apparently assessed potential chronic fatigue disorder symptoms and instructed Bellucco not to work the following week, to rest, and to obtain bloodwork.  (*Id.*).  Treatment notes for the remainder of 2004 demonstrate that Bellucco returned for two appointments complaining of sore throat, nasal congestion, and plugged ears.  (Tr. 407).  The notes also suggest that she had a laparoscopy.  (*Id.*).

On January 28, 2005, Bellucco attended an appointment with Sorrentino complaining of left shoulder discomfort, weakness, and nausea.  (*Id.*).  Sorrentino apparently noted decreased range of motion, assessed rotator cuff tendinitis, and recommended physical therapy.  (*Id.*).  In March 2005, Bellucco attended an appointment complaining of increased stress.  (Tr. 408).  Sorrentino assessed that she suffered from generalized anxiety disorder and

prescribed Clonazepam.  (*Id.*).  Sorrentino returned for a follow-up appointment in June 2005, and Sorrentino assessed that she continued to suffer from generalized anxiety disorder.  (*Id.*).

On April 5, 2006, Bellucco attended an appointment with Sorrentino complaining of cough, as well as persistent insomnia and anxiety.  (Tr. 418).  Treatment notes suggest that sleep was a "major issue."  (*Id.*).  Sorrentino assessed insomnia and anxiety, and renewed Bellucco's prescription for Clonazepam to be used as needed.  (*Id.*).

On April 12, 2006, Bellucco attended an appointment complaining of sinus pressure, cough, and increased fatigue over the previous week.  (Tr. 409).  Sorrentino assessed chronic fatigue immune dysfunction syndrome and fibromyalgia.  (*Id.*).  He advised Bellucco not to work and considered sending her to a rheumatologist.  (*Id.*).  Treatment notes suggest that Bellucco called two days later reporting worsening symptoms and possible dehydration.  (*Id.*).  She was advised to go to the emergency department for intravenous fluids.  (*Id.*).

Bellucco attended an appointment to monitor her depression and anxiety on April 26, 2006.  (Tr. 410).  Sorrentino advised her to continue to refrain from working and to follow up in two weeks.  (*Id.*).  He also prescribed Effexor.  (*Id.*).  The treatment notes suggest that Bellucco may have been referred to another physician to be assessed for lupus.  (*Id.*).  On April 28, 2006, Bellucco called Sorrentino's office and reported that she had not been sleeping or eating, and that she had been crying hysterically.  (*Id.*).  Although the records are difficult to decipher, they appear to suggest that Sorrentino referred Bellucco to a psychiatrist for mental health treatment.  (*Id.*).  Bellucco returned for an appointment on May 1, 2006 complaining of continued difficulty sleeping and that Ambien was not effective.  (Tr. 411).  Sorrentino assessed that she continued to suffer from generalized anxiety disorder and depression.  (*Id.*).  During a follow-up appointment on May 10, 2006, Bellucco reported that she was feeling better.  (*Id.*).

On May 12, 2006, Bellucco called Sorrentino's office complaining that Effexor caused problems sleeping and inquired about alternative medications. (Tr. 412). Sorrentino apparently recommended Zoloft. (*Id.*). On May 19, 2006, Bellucco attended an appointment with Sorrentino to discuss whether she could return to work. (*Id.*). Bellucco indicated that she was not able to work and wanted more time before returning. (*Id.*). Sorrentino agreed that she should not return to work and recommended that she return to be reassessed in two weeks. (*Id.*).

On May 25, 2006, Bellucco returned for an appointment with Sorrentino complaining of insomnia following an increase in her Zoloft dosage. (Tr. 413). Sorrentino decreased the dosage and prescribed Ambien. (*Id.*). On June 2, 2006, Bellucco attended another appointment with Sorrentino and reported that she was sleeping better and that her anxiety had decreased. (*Id.*). Treatment notes suggest that Sorrentino continued to advise Bellucco not to return to work. (*Id.*). On June 14, 2006, Bellucco attended another appointment, reporting improved sleep but continued anxiety since the decrease in her Zoloft dosage. (Tr. 414). Sorrentino increased the dosage and assessed that she suffered from generalized anxiety disorder. (*Id.*).

On July 18, 2006, Bellucco returned for monitoring of her chronic fatigue and fibromyalgia. (Tr. 415). Treatment notes suggest that she had been prescribed medication, including Seroquel, by another doctor. (*Id.*). Sorrentino assessed depression, fibromyalgia, and chronic fatigue. (*Id.*). Treatment notes suggest that Sorrentino thought that Bellucco might be able to return to work on October 1, 2006. (*Id.*). Until then, he recommended that Bellucco not return to work. (*Id.*). Bellucco returned on August 22, 2006 complaining of left-sided TMJ, chronic fatigue, and fibromyalgia. (*Id.*). Treatment notes suggest that Bellucco was also

suffering from pain in her cervical spine.  (*Id.*).  Sorrentino prescribed Flexeril and recommended that Bellucco not return to work until October 1, 2006.  (*Id.*).

Treatment notes dated September 14, 2006 suggest that Sorrentino completed paperwork relating to Bellucco's disability.  (Tr. 416).  On September 26, 2006, Bellucco attended a follow-up appointment with Sorrentino, in which she complained of ongoing pain, depression, and anxiety.  (*Id.*).  Sorrentino assessed that she continued to suffer from fibromyalgia, depression, and anxiety, but recommended that she return to work with restrictions.  (*Id.*).

On December 27, 2006, Bellucco attended a follow-up appointment and reported that her depression had decreased, but that she continued to experience anxiety.  (Tr. 420).  She also complained of fatigue and sore throat.  (*Id.*).  Sorrentino assessed generalized anxiety disorder without depression.  (*Id.*).  His treatment plan contains the notation "no work."  (*Id.*).

There are no additional treatment notes until April 24, 2007, when Bellucco attended a follow-up appointment complaining of worsening anxiety, as well as sinus pressure and nasal congestion.  (Tr. 419).  Sorrentino assessed that her generalized anxiety disorder had worsened.  (*Id.*).  On July 10, 2007, Bellucco attended an appointment complaining of maxillary pain.  (Tr. 321).  She also reported increased stress related to the decision to sell her home.  (*Id.*).  According to Bellucco, she was taking Clonazepam approximately two to three times a day.  (*Id.*).  Sorrentino assessed that Bellucco suffered from sinusitis and anxiety.  (*Id.*).  Bellucco returned for two additional appointments in August 2007 complaining of ongoing sinus symptoms.  (Tr. 320).

Bellucco attended two appointments in 2008 in order to have her medications renewed and to review bloodwork.  (Tr. 318-19).  The treatment notes suggest that her

generalized anxiety disorder was stable. (*Id.*). Bellucco also attended two appointments in 2009. (Tr. 317-18). During the first appointment, in January 2009, she complained of discharge and irritation in her eyes. (*Id.*). Sorrentino assessed sinusitis. (*Id.*). During the second appointment, in December 2009, Bellucco complained of being scratched by a squirrel. (*Id.*).

Bellucco attended three appointments in 2010. (Tr. 314-16). During the first appointment, on January 4, 2010, Sorrentino renewed Bellucco's medications. (*Id.*). On April 27, 2010, Bellucco complained of epigastric pain. (*Id.*). Treatment notes are difficult to decipher, but suggest that Bellucco may have been suffering from Gastroesophageal Reflux Disease ("GERD"). (*Id.*). Sorrentino referred her to another doctor for her allergies. (*Id.*). In August 2010, Bellucco attended an appointment with Sorrentino to review and renew her medications, as well as to assess her cholesterol and to discuss potential celiac disease. (*Id.*).

Bellucco attended two appointments with Sorrentino in 2011. (Tr. 312-13). During the first appointment, in April 2011, Bellucco complained of head and chest congestion and face and ear pain. (*Id.*). The second appointment occurred in December 2011. (*Id.*). Bellucco met with Sorrentino to review her prescriptions. (*Id.*). She also complained that her seasonal affective disorder ("SADS") had gotten worse. (*Id.*). Sorrentino assessed that she suffered from SADS and irritable bowel syndrome. (*Id.*). He adjusted some of her medications and recommended that she increase her exercise. (*Id.*). Bellucco attended a follow-up appointment with Sorrentino on January 16, 2012. (Tr. 312). During the appointment, she reported that she felt better due to the recommended light therapy and that she had not needed to take the Effexor that Sorrentino had prescribed. (*Id.*).

On March 5, 2012, Bellucco attended an appointment with Sorrentino complaining of tremors in both hands. (Tr. 311). Sorrentino assessed chronic fatigue syndrome

and essential tremors.  (*Id.*).  He referred her to Dr. Medved for an evaluation.  (*Id.*).  On July 23,

2012, Bellucco attended another appointment to discuss the results of her bloodwork.  (*Id.*).

Treatment notes suggest that Sorrentino advised her to increase her exercise.  (*Id.*).

A treatment note dated February 2, 2013, indicated that Bellucco's anxiety was

well-controlled with medication, although she continued to experience some social anxiety.

(Tr. 310).  Bellucco also complained of reflux symptoms.  (*Id.*).  Sorrentino recommended that

she be evaluated with a scope.  (*Id.*).

## 2.   Westside Allergy Care

On August 12, 2005, Bellucco attended an appointment with Thomas R. Adler,

("Adler"), MD, at Westside Allergy Care.  (Tr. 233).  Treatment notes suggest that she was

referred by Sorrentino for assessment of her allergies.  (*Id.*).  Bellucco complained of difficulties

with allergies over the previous year, including nasal congestion and scratchy throat.  (*Id.*).  She

reported that she continued to take Flovent twice a day, Claritin as needed, Clonazepam for

stress, and Protonix.  (*Id.*).  She reported weight loss due to stress related to domestic issues.

(*Id.*).  Adler assessed that her allergic rhinitis and asthma were stable, but noted concerns about

her nasal symptoms.  (*Id.*).  He advised her to return in one year.  (*Id.*).

Bellucco returned for an appointment with Adler on August 15, 2006, for

reevaluation of her allergy immunotherapy.  (Tr. 232).  Bellucco reported having a "terrible

time" due to her fibromyalgia and face pain.  (*Id.*).  According to Bellucco, her decline had

started in May, when she experienced facial pain that she associated with a sinus infection.  (*Id.*).

Bellucco reported that the antibiotics caused severe gastrointestinal issues, causing her to lose

weight.  (*Id.*).  She had begun to recover, but recently experienced a return of facial pain, loss of

appetite, and diminished functional activity.  (*Id.*).  She reported that she had been out of work

on disability since May.  (*Id.*).  She reported taking Sudafed and a nasal decongestant, but had

discontinued them due to heart palpitations.  (*Id.*).  According to Bellucco, she was alternating

between Tylenol and ibuprofen every four hours.  (*Id.*).  She was also taking Zoloft, which

caused sleep disturbances.  (*Id.*).  Bellucco reported that her sleep had somewhat improved.

(*Id.*).  She reported no symptoms relating to her allergic rhinitis.  (*Id.*).

Adler noted that Bellucco appeared ill, pale, listless, and depressed, and exhibited

minimal movement.  (*Id.*).  He noted that she had lost weight and that her head showed wasting

of the temporal muscles.  (*Id.*).  She was tender over the TMJs, cheekbones, orbits, and "virtually

anywhere" upon palpation.  (*Id.*).  Adler assessed chronic facial pain with no evidence of

bacterial sinusitis.  (*Id.*).  He believed that antibiotics would pose a risk given her "tenuous

nutritional status."  (*Id.*).  He thought that Effexor or Cymbalta might be more effective than

Zoloft, but believed that any medication adjustment should be determined by her psychiatrist.

(*Id.*).  Adler also considered whether a muscle relaxer would assist her sleep.  (*Id.*).

Bellucco returned for her annual appointment with Adler on August 14, 2007.

(Tr. 231).  Treatment notes indicate that Bellucco continued to receive allergy immunotherapy

for seasonal allergic rhinitis.  (*Id.*).  She continued to complain of chronic nasal congestion and

facial pain.  (*Id.*).  She attributed many of her symptoms to renovations associated with her move

to a new home.  (*Id.*).  Upon examination, Adler noted that she had gained some weight and,

although she had some facial tenderness, she had no obstruction or purulent drainage.  (*Id.*).

Adler advised Bellucco that her sinus disease was not likely the cause of all her

facial pain and that other causes should be explored.  (*Id.*).  Bellucco indicated she was not

interested in exploring other causes because she believed that her sinuses were the cause of her

symptoms.  (*Id.*).  Adler advised her to discontinue Flovent and to continue taking albuterol as

needed and Protonix for reflux.  (*Id.*).  He also suggested a repeat allergy skin test to evaluate the effectiveness of her allergy shots.  (*Id.*).

### 3.      West Ridge Obstetrics & Gynecology, LLP

Treatment records demonstrate that Bellucco received ongoing gynecological care from Judith E. Kerpelman ("Kerpelman"), MD, at West Ridge Obstetrics & Gynecology, LLP. (Tr. 271-94).  On July 25, 2008, Bellucco attended an appointment with Kerpelman and indicated that she suffered from fatigue, muscle weakness, dizziness, headaches, and depression, among other ailments.  (Tr. 283-84).  Kerpelman noted that Bellucco had been diagnosed with fibromyalgia and depression, but that these conditions were "under control."  (*Id.*).

### 4.      Rochester Medical Group

On April 30, 2010, Bellucco was evaluated for food allergies by S. Shahzed Mustafa ("Mustafa"), MD, at the Rochester General Hospital Allergy, Immunology and Rheumatology Clinic.  (Tr. 265-67).  Bellucco reported an adverse reaction, including an itchy throat, throat tightness, and an abnormal sensation on her tongue, after eating bread approximately one month earlier.  (*Id.*).  Since then, she had continued to eat gluten without incident.  (*Id.*).  She also reported adverse reactions to corn, cereals, and certain fruits.  (*Id.*). Bellucco reported that she had received allergy shots between 1999 and 2007, which had improved her symptoms.  (*Id.*).  She reported continued nasal congestion, rhinorrhea, postnasal drip, and sneezing.  (*Id.*).  She was not taking medication to address her symptoms.  (*Id.*).

Mustafa's notes indicate that Bellucco had a past medical history that included chronic fatigue syndrome, fibromyalgia, GERD, depression, anxiety, lactose intolerance, mild, intermittent asthma, and allergic rhinitis.  (*Id.*).  She was currently taking Sertraline, omeprazole, Clonazepam, and Loratadine.  (*Id.*).  After conducting skin testing, Mustafa concluded that

Bellucco was not allergic to wheat and was not at risk of anaphylaxis, although she might suffer

from an intolerance. (*Id.*). She likely suffered from an oral allergy syndrome relating to certain

fruits. (*Id.*). She was advised to avoid those fruits, pretreat with antihistamines, or receive

allergen immunotherapy for aeroallergens. (*Id.*). She could continue to eat the tested foods as

tolerated and to treat with antihistamines as needed. (*Id.*).

### 5.      Louis H. Medved, MD

On April 4, 2012, Bellucco attended a neurological consultation with Louis H.

Medved ("Medved"), MD. (Tr. 299-300). The purpose of the consultation was to evaluate

Bellucco's hand tremors. (*Id.*). Bellucco reported that she had experienced mild tremors for

approximately twenty years, which began about the time she was diagnosed with chronic fatigue

syndrome and fibromyalgia. (*Id.*). Her tremors had increased in frequency during the previous

months, and she was now experiencing them daily, particularly if she performed tasks requiring

fine motor skills, such as sewing, turning pages of a book, or using a computer mouse. (*Id.*).

Her past medical history, in addition to chronic fatigue syndrome and fibromyalgia, also

included GERD, hyperlipidemia, depression, anxiety, and insomnia. (*Id.*). She was currently

taking omeprazole, Sertraline, red yeast rice, Loratadine as needed, ibuprofen, acetaminophen,

and Clonazepam as needed for sleep, which she took several times a week. (*Id.*). After an

examination, Medved assessed familial essential tremor and indicated that Bellucco had no

evidence of Parkinsonism. (*Id.*). He predicted that her tremors would increase over time, and

Bellucco acknowledged that she noticed an increase in her tremors with nervousness, fatigue, or

when performing fine motor tasks. (*Id.*). She reported that she was generally able to function

and that the tremors were more of a nuisance. (*Id.*). She was not interested in treatment and was

looking for reassurance that the tremors were not associated with a serious illness.  (*Id.*).

Medved advised her to return if needed.  (*Id.*).

### B.     <u>Medical Opinion Evidence</u>

On September 27, 2006, Sorrentino authorized Bellucco to return to work on

October 1, 2006 with limitations.  (Tr. 373).  Specifically, he indicated that she should avoid

stress, teller duties and keyboarding, and repetitive bending, flexing, or lifting more than five

pounds.  (*Id.*).  He also limited her to working three days a week.  (*Id.*).

On September 11, 2012, Sorrentino completed a form at the request of the New

York State Office of Temporary and Disability Assistance, Division of Disability

Determinations.  (Tr. 301-05).  Sorrentino indicated that he began treating Bellucco in 1987 and

had provided treatment to her approximately every three to six months.  (*Id.*).  He had last

examined her on July 23, 2012.  (*Id.*).

Sorrentino indicated that Bellucco suffered from seasonal affective disorder,

anxiety, and esophagitis.  (*Id.*).  He also noted that he treated her for generalized anxiety disorder

and depression.  (*Id.*).  Sorrentino indicated that Bellucco's condition was permanent and that she

had suffered from anxiety and depression for more than five years.  (*Id.*).  The third page of the

form contained questions relating to fatigue, which Sorrentino left blank.  (*Id.*).  Sorrentino

assessed that Bellucco did not have any lifting, carrying, standing, walking, sitting, pushing,

pulling, or postural limitations.  (*Id.*).

On February 14, 2013, Sorrentino completed a Physical Residual Functional

Capacity ("RFC") Questionnaire.  (Tr. 367-71).  He indicated that he had provided treatment to

Bellucco every three to six months since 1987.  (*Id.*).  He indicated that she had been diagnosed

with anxiety, depression, and fibromyalgia and that her prognosis was guarded.  (*Id.*).  According

to Sorrentino, Bellucco was anxious, antisocial, depressed, and had trigger points for pain. (*Id.*).

He assessed that her pain was moderate to severe and that she objectively presented as depressed

with psychomotor retardation. (*Id.*). He had prescribed Clonazepam and Sertraline to address

her symptoms. (*Id.*). He assessed that her impairments would persist for more than one year and

that she was not a malingerer. (*Id.*).

According to Sorrentino, Bellucco's depression and anxiety affected her physical

condition, and he assessed that she would frequently[4] experience pain or other symptoms severe

enough to interfere with the attention and concentration necessary to perform even simple work

tasks. (*Id.*). He assessed that Bellucco was incapable of performing even a low stress job. (*Id.*).

According to Sorrentino, Bellucco could sit, stand, or walk at least six hours of an eight-hour

workday and would not need to take any unscheduled breaks. (*Id.*). He opined that she could

frequently lift less than ten pounds, occasionally lift up to ten pounds, and rarely lift more than

twenty pounds. (*Id.*). He opined that Bellucco did not have any limitations with reaching,

handling, or fingering. (*Id.*). According to Sorrentino, Bellucco's impairments would cause her

to experience good days and bad days, and he assessed that she was likely to be absent more than

four days a month. (*Id.*).

On December 30, 2013, Sorrentino updated his September 2012 opinion.

(Tr. 437-41). According to Sorrentino, in addition to seasonal affective disorder, anxiety, and

esophagitis, Bellucco also suffered from fibromyalgia and chronic fatigue. (*Id.*). He noted that

Bellucco had been out of work since 2006 secondary to her severe chronic fatigue syndrome

with fibromyalgia, depression, and anxiety, all of which he expected to be permanent. (*Id.*). On

this form, Sorrentino completed the questions relating to fatigue, indicating that Bellucco

suffered from chronic fatigue that was exacerbated by stress. (*Id.*). According to Sorrentino,

---

[4] Frequently was defined to mean 34% to 66% of an eight-hour workday. (*Id.*).

Bellucco could require up to seven days to recuperate from severe fatigue. (*Id.*). He noted objective signs that he opined were secondary to her chronic fatigue, including depression and anxiety. (*Id.*).

Sorrentino opined that Bellucco was limited to occasional lifting and carrying up to five pounds during a workday, but had no limitations for sitting, standing, or walking. (*Id.*). He assessed that she was unable to participate in repetitive keyboarding or arm and hand motions. (*Id.*). He also opined that she was incapable of working more than five hours a day or more than three days a week. (*Id.*). Sorrentino noted that his opinion had changed due to "worsening symptoms since the last report." (*Id.*).

**C.** **Bellucco's Diary Entries**

In connection with her application for benefits, Bellucco submitted apparent diary entries or notes relating to the period 2005 to 2006. (Tr. 195-216). The notes suggest that Bellucco began feeling anxious in July 2004 when she was refinancing her house and planning and packing for a trip to Disney World. (*Id.*). Bellucco then suffered intense back pain for two weeks. (*Id.*). During October 2004, she felt sick and weak due to her chronic fatigue syndrome. (*Id.*). She underwent laparoscopic surgery in December 2004. (*Id.*). She indicated that for the next seven months, she experienced tendonitis in her shoulders and back, which caused pain and fatigue in her extremities. (*Id.*).

According to the notes, in March 2005 Bellucco suffered from stress, causing stomach pain and chest tightness. (*Id.*). She also experienced crying spells and feelings of "fight or flight." (*Id.*). She described weight loss and feelings of helplessness. (*Id.*). According to the notes, she reported these symptoms to Sorrentino, who recommended antianxiety medicine and

counseling.  (*Id.*).  Bellucco also described difficulty dealing with certain customers at work. (*Id.*).

Bellucco described becoming very ill in April 2006.  (*Id.*).  According to Bellucco, her illness started with a sinus infection and bronchitis and resulted in severe chronic fatigue.  (*Id.*).  She was prescribed antibiotics, which caused gastrointestinal issues.  (*Id.*).  She was unable to eat or walk to the bathroom without assistance, and she suffered from depression and anxiety.  (*Id.*).  Eventually, she went to the emergency room due to dehydration and was provided intravenous fluids.  (*Id.*).  Bellucco described that she was unable to sleep, despite being very sick and weak, which led to feelings of hopelessness.  (*Id.*).

According to the notes, in September 2006 Bellucco experienced crying spells and stomach, thigh, ovary, and back pain.  (*Id.*).  Her employer had requested a more specific note from her doctor regarding her ability to return to work with limitations.  (*Id.*).  Bellucco noted that she expected to be terminated and that the uncertainty over her job created anxiety. (*Id.*).  She also noted difficulty sleeping.  (*Id.*).  She continued to suffer from fibromyalgia, depression, crying spells, and stress caused by her impending return to work.  (*Id.*).  According to Bellucco, she still experienced feelings of depression and anxiety despite an increase in the dosage of her prescribed Zoloft.  (*Id.*).  On September 28, 2006, Bellucco noted that she had received a certified letter from her employer terminating her.  (*Id.*).  According to Bellucco, the decision had been made before she could obtain updated documentation from Sorrentino.  (*Id.*).

D.    **Administrative Hearing Testimony**

During the administrative hearing, Bellucco testified that she was forty-eight years old and had obtained a bachelor's degree in political science and psychology.  (Tr. 42, 67).

She lived with her husband.  (Tr. 43).  Bellucco testified that she had not worked since June 2006 and had previously been employed as a bank teller and in retail.  (Tr. 43-54).

According to Bellucco, shortly after her son was born in 1989 she began receiving treatment from Sorrentino for fatigue.  (Tr. 56).  Bellucco testified that Sorrentino performed many tests during the ensuing years and her diagnosis resulted from a process of elimination. (Tr. 56-57).  She suffered from kidney pain, gastritis, migraines, shoulder tension, and extreme facial pain.  (Tr. 57-58).  According to Bellucco, sometimes her pain was so intense that, for months at a time, she had to sleep sitting in a chair.  (Tr. 60).  At other times, she felt "somewhat better."  (*Id.*).

Bellucco testified that she found her employment as a bank teller to be overwhelming and suffered pain throughout the workday.  (Tr. 55).  According to Bellucco, after providing documentation from Sorrentino, her employer had provided her a workstation to attempt to accommodate her impairments.  (*Id.*).  Despite these efforts, Bellucco was never truly comfortable at work and was in tears by the end of the workday due to her pain.  (*Id.*).

Bellucco testified that her impairments caused her to be less efficient and productive at work.  (Tr. 58).  According to Bellucco, she suffered from "fibro fog" and chronic fatigue, which impaired her ability to think.  (*Id.*).  She testified that her slow productivity had resulted in reprimands by her employer.  (*Id.*).

Bellucco testified that during the summer of 2006 she felt like she experienced a nervous breakdown and had a significant flare-up of her chronic fatigue and fibromyalgia symptoms.  (Tr. 56).  During that time, Sorrentino placed her on short-term disability.  (*Id.*).  She explained that she began with an infection that developed into chronic fatigue, accompanied by

extreme pain.  (Tr. 60).  She reported that she was so weak that her husband had to carry her to the bathroom.  (*Id.*).

According to Bellucco, she has continued to suffer from pain and fatigue since her termination.  (Tr. 61).  She testified that both of these impairments cause cognitive difficulties that limit her ability to drive and to complete everyday tasks.  (*Id.*).  She also testified that although she continues to suffer from fibromyalgia and chronic fatigue, she has experienced some lessening of her pain as a result of not working every day.  (*Id.*).  Bellucco believed that the severe pain caused by her fibromyalgia would return if she were to return to work.  (Tr. 62).

Bellucco testified that on good days she attempts to complete household chores, but feels unwell if she overdoes it.  (Tr. 62-63).  She indicated that she is sometimes able to use a vacuum cleaner, occasionally shops for groceries, but rarely cooks.  (Tr. 62-64).  Bellucco indicated that she is able to drive, but does not do so often, and leaves the house only about three times a week.  (*Id.*).  According to Bellucco, she has not gone out of town since a 2011 trip to Disney World, which she navigated with the use of a wheelchair.  (*Id.*).

Bellucco testified that she was taking Sertraline and Clonazepam to address her mental health issues and that the medications caused her to feel fatigued.  (*Id.*).  Otherwise, the medications had improved her mental health and were effective in preventing panic attacks.  (Tr. 65-66).  Bellucco testified that prior to the medications she experienced "torturous" panic attacks characterized by heart palpitations and a "flight or fight" feeling, but now is able to sense an imminent attack and prevent it with medication.  (Tr. 65-67).

Peter Manzi ("Manzi"), a vocational expert, also testified during the hearing. (Tr. 68-75, 168).  The ALJ asked Manzi to characterize Bellucco's previous employment.

(Tr. 69).  According to Manzi, Bellucco previously had been employed as an inventory clerk, displayer of merchandise, salesperson, and teller.  (*Id.*).

The ALJ asked Manzi whether a person would be able to perform Bellucco's previous jobs who was the same age as Bellucco, with the same education and vocational profile, and who was able to perform the full range of sedentary work, but who was limited to jobs involving low-stress work, meaning only occasional decision-making and interaction with coworkers and the general public, and which required no more than frequent fingering and handling.  (Tr. 70).  The ALJ further indicated that the position must permit a ten-minute break after fifteen minutes of continuous typing.  (*Id.*).  Manzi testified that such an individual would be unable to perform Bellucco's previous employment positions.  (*Id.*).  Manzi testified that such an individual would be able to perform other jobs existing in the national economy, including addresser and table worker.  (Tr. 70-71).

The ALJ asked Manzi whether jobs would exist for the same individual with the same limitations, except that the individual would need a ten-minute break after only five minutes of continuous typing.  (Tr. 71).  Manzi testified that such an individual would be able perform the positions of addresser and table worker.  (*Id.*).

The ALJ then asked Manzi whether jobs would exist for the same individual with the same limitations, except that the individual would be limited to working no more than five hours a day and no more than three days a week.  (Tr. 71-72).  Manzi testified that such limitations would preclude gainful employment. (*Id.*).  Finally, the ALJ asked Manzi whether an individual who had the previously-identified limitations, but not the hourly and days per week limitations, and who was further limited to lifting only five pounds, would be able to perform the positions of addresser and table work.  (*Id.*).  Manzi testified that such an individual could not

perform the previously-identified positions.  (Tr. 72).  Manzi testified that such an individual

would be able to perform the position of surveillance system monitor.  (Tr. 72-73).

Bellucco's attorney asked whether the surveillance system monitor position

required particular attention, focus, or concentration.  (Tr. 73).  Manzi testified that the position

would require "a high level of concentration and attention."  (*Id.*).  According to Manzi, an

individual who was off-task fifteen percent of the time would be unable to perform this position.

(Tr. 73-74).  Manzi testified that an individual could only be off-task for approximately three or

four percent of the time and still maintain this position.  (*Id.*).  Finally, Manzi testified that an

individual who was absent four or more days a month would be unable to sustain employment.

(Tr. 74).


## DISCUSSION

### I.       Standard of Review

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

> (1)    whether the claimant is currently engaged in substantial gainful activity;

    (2)       if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

    (3)       if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

    (4)       if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

    (5)       if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## A.    <u>The ALJ's Decision</u>

        In his decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 17-25).  Under step one of the process, the ALJ found that Bellucco had not engaged in substantial gainful activity between June 1, 2006 and December 31, 2011, the period between her alleged onset date and her date last insured.  (Tr. 19).  At step two, the ALJ concluded that Bellucco had the severe impairments of chronic fatigue syndrome, depressive disorder, and anxiety disorder through her date last insured.  (*Id.*).  The ALJ determined that Bellucco's allegations of fibromyalgia were not medically determinable.  (*Id.*).  At step three, the ALJ determined that Bellucco did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments through her date last insured.

(Tr. 19-21).  With respect to Bellucco's mental limitations, the ALJ concluded that she had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, or pace.  (*Id.*).  The ALJ concluded that through her date last insured Bellucco had the RFC to perform sedentary work, except that she was only capable of frequent handling and fingering and was only able to type for fifteen minutes continuously before requiring a short break and was limited to low stress work, defined as involving only occasional decision-making and occasional interaction with coworkers and the general public. (Tr. 21-24).  At steps four and five, the ALJ determined that through her date last insured Bellucco was unable to perform her previous employment positions, but that other jobs existed in the national economy that Bellucco could perform, including addresser[5] and table worker. (Tr. 24-25).  Accordingly, the ALJ found that Bellucco was not disabled through December 31, 2011, her date last insured.  (*Id.*).

### B.     Bellucco's Contentions

Bellucco contends that the ALJ's RFC determination is not supported by substantial evidence and is the product of legal error.  (Docket # 9-1).  First, Bellucco maintains that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to properly consider opinions submitted by her treating physician and failed to recontact the treating physician to resolve ambiguities in the record.  (Docket ## 9-1 at 9-15; 12 at 1-3). Next, Bellucco contends that that ALJ's RFC determination is not supported by substantial evidence because it was not supported by a medical assessment of her functional ability to complete work-related activities.  (Docket # 9-1 at 15-17).

---

[5] The ALJ's decision actually indicates that Bellucco could perform the position of "dresser" – a likely typographical error considering the vocational expert's testimony identifying the position as "addresser."  (Tr. 25, 70).

II.    <u>Analysis</u>

An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

Bellucco argues that the ALJ improperly evaluated the opinions submitted by Sorrentino, her treating physician.  (Docket ## 9-1 at 11-16; 12 at 1-3).  According to Bellucco, the ALJ erroneously rejected three of Sorrentino's opinions solely because they were issued after her date last insured.  (*Id.*).  With respect to Sorrentino's 2006 assessment of her limitations, Bellucco maintains that the ALJ improperly concluded that Sorrentino intended the limitations to be temporary.  (*Id.*).  According to Bellucco, the record was unclear whether Sorrentino's 2006 opinion was meant to be temporary and whether his subsequent opinions were retroactive in nature.  (*Id.*).  These ambiguities, Bellucco maintains, warranted recontacting Sorrentino for clarification.  (*Id.*).  In any event, Bellucco argues, the ALJ's RFC assessment is not supported by substantial evidence because it is not supported by any medical opinion of record.  (Docket # 9-1 at 15-17).

"It is well established in the Second Circuit that an ALJ is under an obligation to develop the administrative record fully, to ensure that there are no inconsistencies in the record that require further inquiry, and to obtain the reports of treating physicians and elicit the appropriate testimony during the proceeding." *Martello v. Astrue*, 2013 WL 1337311, *3 (W.D.N.Y. 2013).  Given the non-adversarial nature of a Social Security hearing, "[t]he duty of the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) (quoting *Butts*, 388 F.3d at 386).  Accordingly, before determining whether the ALJ's conclusions are supported by substantial evidence, a court must first evaluate whether the claimant was provided a full hearing "in accordance with the beneficent purposes of the [Social Security] Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *see also Archbald v. Colvin*, 2015 WL 7294555, *3 (E.D.N.Y. 2015) ("[t]he reviewing court must ensure that 'all of the relevant facts [are] sufficiently developed and considered'") (quoting *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980)).  The ALJ's duty to develop the record is particularly important where "the ALJ has recognized an impairment and subsequently must determine the date of its onset." *See Lacava v. Astrue*, 2012 WL 6621731, *12 (S.D.N.Y. 2012) (citing SSR 83-20, 1983 WL 31249 (1983)), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. 2012).

The ALJ's duty to obtain additional evidence is triggered "only where there are 'obvious gaps in the administrative record.'" *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir. 1999)).  Yet, if the record is unclear or contains ambiguities, an ALJ is required to try to fill any gaps or resolve any ambiguities, particularly before rejecting a treating physician's opinion. *Selian v. Astrue*, 708 F.3d 409, 420

(2d Cir. 2013) ("to the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis") (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)).

Accordingly, "the 'treating physician rule' is inextricably linked to the duty to develop the record." *Lacava v. Astrue*, 2012 WL 6621731 at *13. Where the gap or ambiguity at issue concerns an opinion provided by a treating physician, the ALJ has "discretion to 'determine the best way to resolve the inconsistency or insufficiency' based on the facts of the case."[6] *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 505 (S.D.N.Y. 2014) (quoting 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1)). Nevertheless, the regulations continue to "contemplate the ALJ recontacting treating physicians when 'the additional information needed is directly related to that source's medical opinion.'" *Jimenez v. Astrue*, 2013 WL 4400533, *11 (S.D.N.Y. 2013) (quoting *How We Collect and Consider Evidence of Disability*, 77 Fed. Reg. 10,651, 10,652 (Feb. 23 2012)).

A longitudinal review of Bellucco's medical history reveals that she has long suffered from chronic fatigue syndrome. Treatment notes containing or referring to this diagnosis appear as early as 1990. (Tr. 378). Despite this diagnosis, and its accompanying symptoms, Bellucco worked between 1985 and 2006. (Tr. 174). During that time, she consistently, though not frequently, sought and received treatment from Sorrentino for various complaints, including pain and fatigue-related symptoms. (Tr. 377-408).

In 2005 and 2006, the medical records suggest that Bellucco's health began to decline. She was diagnosed with generalized anxiety disorder, depression, and fibromyalgia, and

---

[6] On March 26, 2012, the regulations were amended to delete the provision that imposed a duty to recontact a treating physician when "the report from [a claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not [contain all the necessary information, or does not] appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Quinn v. Colvin*, 2016 WL 4255020, *12 n.2 (W.D.N.Y. 2016) (quoting 20 C.F.R. § 404.1512(e) (before amendment)).

suffered from insomnia.  (Tr. 407-10, 418).  Sorrentino apparently placed Bellucco on temporary

disability in April or May 2006.  (Tr. 56, 330-32, 410-15).  Bellucco's symptoms continued to

prevent her return to work until mid-September 2006, at which time Sorrentino assessed that she

would be able to return to work with restrictions.  (Tr. 373).  Before she was able to return to

work, she was terminated and has not been employed since September 2006.  (Tr. 174, 212).

      The medical records suggest that after 2006 Bellucco continued to suffer from

anxiety, depression, chronic fatigue, and fibromyalgia, but that her conditions were generally

managed by medication and monitored by Sorrentino through periodic appointments.  In

addition, at some point Bellucco was also apparently diagnosed with SADS.  (Tr. 312).

      This record demonstrates that Bellucco has long suffered from a variety of

medical impairments that did not preclude her ability to work until 2006, when she was placed

on temporary disability by Sorrentino.  In September 2006, Sorrentino opined that she could

return to work, but was limited to three days a week and could not be exposed to stress or certain

activities involving use of her hands, bending, and lifting.  (Tr. 373).  This opinion is the only

medical assessment in the record of Bellucco's work-related capabilities issued during the

relevant period.

      Subsequent to Bellucco's last insured date, Sorrentino issued three opinions

assessing some of her work-related capabilities.  The first, dated September 2012 –

approximately nine months after her date last insured, is silent with respect to whether Bellucco

suffered from chronic fatigue syndrome or fibromyalgia and whether those impairments caused

her any work-related limitations.  (Tr. 301-05).  The form primarily sought information relating

to exertional limitations, and Sorrentino did not include any assessment of Bellucco's mental

capacity for work-related functions.  (*Id.*).  The February 2013 opinion, dated approximately

fourteen months after her date last insured, assessed limitations relating to anxiety, depression,
and fibromyalgia.  (Tr. 367-71).  In that opinion, Sorrentino assessed that Bellucco did not suffer
from significant exertional limitations, with the exception of some lifting restrictions, but her
pain and difficulty dealing with stress would significantly affect her ability to perform
work-related functions on a consistent basis.  (*Id.*).  Finally, the December 2013 opinion, dated
approximately twenty-four months after Bellucco's date last insured, updated the September
2012 assessment to include limitations relating to chronic fatigue and fibromyalgia.
(Tr. 437-41).  Again, other than a five-pound lifting restriction and some upper extremity
restrictions, Sorrentino opined that Bellucco did not suffer from significant exertional
limitations; he did opine that she suffered from fatigue and anxiety and would be unable to work
more than five hours a day or three days a week.  (*Id.*).

      With respect to the September 2006 assessment of Bellucco's ability to return to
work, the ALJ inferred that the limitations Sorrentino identified were intended to be temporary,
and thus the ALJ did not consider them or give them controlling weight in formulating his RFC.
(Tr. 23).  Although I do not disagree that Sorrentino may have expected the limitations to be
temporary at the time he imposed them, the question whether Sorrentino would have lifted,
modified, or continued the restrictions is impossible to answer from the record.  Instead of
returning to work, Bellucco was terminated, and continued to suffer from the same impairments.

      I disagree with the ALJ that the only inference to be drawn from the medical
records is that the limitations identified by Sorrentino were in fact temporary in nature.  In
making this inference, the ALJ noted that the medical records demonstrate benign examination
results.  (Tr. 21).  To the extent that the ALJ was referring to the May 2011 examination
performed by Kerpleman, Bellucco's gynecologist (*see* Tr. 21 ("[o]n routine physical

examination in May 2011, a review of systems was normal"); *see also* Tr. 272-74), the results of

a gynecological examination are unlikely to illuminate the status of non-gynecological

impairments.  Further, Sorrentino's treatments notes are remarkably sparse, difficult to decipher,

and rarely, if ever, include any extensive description of objective examination findings.[7]

Accordingly, little in the record suggests benign objective findings.

   I similarly disagree that Bellucco's treatment with Sorrentino, which the ALJ

characterized as "infrequent/no treatment," supports a reasonable inference that Sorrentino's

limitations were temporary.  (Tr. 23).  As an initial matter, the ALJ's characterization is inapt.  A

longitudinal review of the record demonstrates that Bellucco treated with Sorrentino for decades.

During that history, she received frequent treatment when she was initially diagnosed with her

impairments and again during 2006 when she experienced a deterioration in her health.  After

she stopped working in September 2006, the frequency of her treatment with Sorrentino

declined, but she consistently received treatment, medication management, and monitoring of her

existing conditions.  Rather than suggesting any transience in her conditions, Bellucco's ongoing

treatment with Sorrentino suggests the opposite – that she continues to suffer from significant

impairments that are managed and monitored by her longtime primary care physician.

   Finally, I also disagree with any notion that Sorrentino's September 2012 opinion

may fairly be read to support the inference that the September 2006 limitations were temporary

in nature.  (*Id.*).  As discussed above, in September 2006 Sorrentino opined that, in addition to

exertional limitations, Bellucco should not be exposed to workplace stress and could only work

three days a week.  The September 2012 form is silent regarding stress limitations or Bellucco's

ability to engage in full-time employment, and Sorrentino's silence should not be interpreted to

---

[7] Indeed, the ALJ concluded that Bellucco's fibromyalgia was not severe because the record lacked
objective findings of historical pain and trigger points.  (Tr. 19, 22).  Whether Sorrentino's treatment included such
findings is a topic that may be explored further with Sorrentino on remand.

suggest that the limitations identified in 2006 were temporary.  *See Miller v. Colvin*, 2016 WL

4478690, *14 (W.D.N.Y. 2016) ("an ALJ should not interpret a physician's silence on a

particular limitations as an opinion from the physician that the limitation does not exist") (citing

*Cahill v. Colvin*, 2013 WL 4034381, *18 (E.D. Pa. 2013) ("the proper inference from silence

about RFC in a treating physician's report is that the issue was not considered")).

Moreover, Sorrentino's February 2013 opinion explicitly assessed limitations

relating to anxiety, depression, and fibromyalgia, and clearly suggested that Bellucco's pain and

inability to manage stress would interfere with her ability to work on a full-time, consistent

basis.[8]  (Tr. 367-71).  Specifically, Sorrentino opined that Bellucco was incapable of performing

even a "low-stress" job.  (Tr. 368).  Read in combination, Sorrentino's reports reveal that

Bellucco continues to suffer from multiple serious conditions, for which Sorrentino was treating

her in 2006, if not earlier, and that, in his view, Bellucco continues to have difficulty managing

stress and working on a full-time basis.

Of course, "medical evidence generated after an ALJ's decision cannot [be]

deemed irrelevant solely because of timing."  *Newbury v. Astrue*, 321 F. App'x 16, *2 n.2 (2d

Cir. 2009).  Although "a treating physician's retrospective [opinion] is not conclusive, it is

entitled to controlling weight unless it is contradicted by other medical evidence or

overwhelmingly compelling non-medical evidence."  *Reynolds v. Colvin*, 570 F. App'x 45, 48

(2d Cir. 2014) (quotation omitted).  Here, Sorrentino's 2012 and 2013 opinions do not clearly

state that they are retroactive, and his December 2013 opinion suggests that Bellucco's condition

had recently worsened.  Nonetheless, the opinions were provided by Bellucco's primary care

physician who had treated her throughout the entirety of the relevant period for the very

---

[8]  At the hearing, Bellucco's attorney explained that Sorrentino had completed the February 2013 form at counsel's request to address all of his "diagnoses that were pertinent to the case," some of which he had inexplicably omitted from the September 2012 form.  (Tr. 42).

impairments for which she claims disability.  This longstanding relationship, along with

Sorrentino's statement in the December 2013 opinion that Bellucco had "been out of work since

2006 secondary to severe chronic fatigue syndrome [with] fibromyalgia, depression and anxiety"

(Tr. 438), strongly suggest that Sorrentino would be available and able to provide a retrospective

assessment of Bellucco's functional abilities during the relevant period.  Under these

circumstances, the ALJ should have recontacted Sorrentino to attempt to determine whether his

opinions were intended to be retrospective and, if not, to attempt to obtain one for the relevant

period.  *See Lacava*, 2012 WL 6621731 at *13 ("[w]here there is ambiguity regarding whether a

treating physician's statement bears on the alleged period of disability, the ALJ must seek to

resolve this ambiguity"); *Wright v. Astrue*, 2008 WL 620733, *2 (E.D.N.Y. 2008) ("[w]hile these

opinions were rendered after the relevant period, [one doctor] had treated [plaintiff] since 1997,

. . . and [the other doctor] specifically stated that [plaintiff] suffered from the symptoms and

limitations described in his report since 1999[;] . . . to the extent the ALJ rejected these opinions

because they did not state whether they described [plaintiff's] conditions during the relevant

period, he should have attempted 'to fill' this 'gap in the administrative record'") (quoting *Rosa

v. Callahan*, 168 F.3d at 79).

    In sum, despite an apparently uninterrupted twenty-five-year treating relationship

between Sorrentino and Bellucco, the ALJ discounted all of the restrictions assessed by

Sorrentino without recontacting him to determine whether the limitations he identified applied to

the relevant period or whether he had an ability to provide an opinion of Bellucco's physical and

mental capacity to perform work-related functions during the relevant period.  This was error and

warrants remand.  *See Lacava*, 2012 WL 6621731 at *17 (remanding where ALJ should have

clarified whether treating physician's opinions related to the relevant period or requested a

retrospective opinion); *Rogers v. Astrue*, 895 F. Supp. 2d 541, 552 (S.D.N.Y. 2012) ("it was

legal error for the ALJ to rely on [p]laintiff's lack of evidence from the relevant time period to

deny benefits without first attempting to adequately develop the record, or to pursue or consider

the possibility of retrospective diagnosis") (internal quotation omitted); *Wiebicke v. Astrue*, 2012

WL 2861681, *17 (S.D.N.Y. 2012) (finding error where report prepared by physician who had

treated plaintiff for relevant impairments during relevant period was ambiguous as to whether it

provided retrospective opinion; "[t]o discharge his duty to develop the record, the ALJ should

have sought clarification from [the treating physician] as to whether his . . . impressions applied

to the period at issue[, or] . . . the ALJ could have asked [the treating physician] to provide a

retrospective opinion of [plaintiff's] condition during the time period for which [plaintiff] was

claiming disability"; remand nonetheless not warranted because even if opinions were

retrospective, they were contradicted by other record evidence); *Pino v. Astrue*, 2010 WL

5904110, *20-21 (S.D.N.Y. 2010) (remanding where ALJ failed to seek retrospective opinion

from treating psychiatrist who assessed significant limitations in opinion authored after relevant

period; "[h]er opinion, based on her extensive treatment of plaintiff (continuing for roughly nine

years as of the date of the ALJ's decision) and also on the records [from the relevant time

period], . . . could have provided considerable insight") (relying on superseded 20 C.F.R.

§ 404.1512(e)), *report and recommendation adopted*, 2011 WL 814721 (S.D.N.Y. 2011).

Accordingly, remand is appropriate for the ALJ to recontact Sorrentino to clarify whether his

opinions were intended to be retrospective and, if not, to attempt to obtain a retrospective

opinion of Bellucco's mental and physical work-related capabilities between 2006 and her date

last insured.

## <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 10**) is **DENIED**, and Bellucco's motion for judgment on the pleadings (**Docket # 9**) is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**


        *s/Marian W. Payson*
        MARIAN W. PAYSON
        United States Magistrate Judge

Dated: Rochester, New York
      September 23, 2016